**IN THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **Mary Kay Scanlon** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | |
| v. ) | Case No. |
| ) | |
| ) | |
| **Archdiocese of Kansas City** ) | |
| **in Kansas** ) | JURY TRIAL DEMANDED |
| 12615 Parallel Parkway ) | |
| Kansas City, Kansas 66109 ) | |
| ) | |
| and ) | |
| ) | |
| **Holy Trinity Catholic Church Lenexa** ) | |
| 13615 W. 92nd Street ) | |
| Lenexa, KS 66215 ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT FOR DAMAGES

Mary Kay Scanlon asserts numerous claims against Defendants as set forth herein:

## PARTIES

1.      Plaintiff Mary Kay Scanlon ("Scanlon") is an individual who resides at 13712 West 80th Street, Lenexa, Kansas 66215.  Scanlon was previously the Program Director at Holy Trinity Early Education Center.

2.      Hallie A. Richter ("Richter") is an individual who resides in Overland Park, Kansas 66223.  Richter has a legal action pending against the same Defendants in this Court; *See Hallie A. Richter v. Archdiocese of Kansas City in Kansas and Holy Trinity Catholic Church Lenexa*; Case No. Case No. 2:21-cv-02520-SAC-TJJ.

3.      Defendant Archdiocese of Kansas City in Kansas ("Archdiocese") is a non-profit

organization operating at 12615 Parallel Parkway, Kansas City, Kansas 66109.

4.     Holy Trinity Early Education Center ("HTEEC") is a non-profit organization operating at 9201 Summit, Lenexa, KS 66215.

5.     HTEEC is a licensed childcare facility in the State of Kansas licensed and supervised by the Kansas Department of Health and Environment ("KDHE"). HTEEC offers preschool, parents' day-out programs, and after-school care.

6.     Holy Trinity Catholic School ("HTCS") is a non-profit organization operating at 13600 W. 92nd Street, Lenexa, Kansas 66215. Scott Merfen is the Principal of HTCS.

7.     Defendant Holy Trinity Catholic Church Lenexa ("HTCC" or "Parish") is a non-profit organization operating at 13615 W. 92nd Street, Lenexa, KS 66215.  The Priest of HTCC is Father (Fr.) Michael (Mike) Koller. Stan Nill is Business Manager.

8.     Defendants Archdiocese of Kansas City in Kansas and Holy Trinity Catholic Church Lenexa are sued individually and collectively.  Together, the Defendants operate as co-employers because, although separate legal entities, the two named Defendant entities, engage in coordinated and shared employment policies and practices which effected Plaintiff and other employees, namely by providing employment supervision, job coaching, counseling, training, education, benefits, policies and shared human resource services, among other factors and functions which deems the entities to be co-employers.

9.     According to its website, the Archdiocese provides human resources services to the many employers within the Archdiocese: "The Archdiocesan Church recognizes the need for an over-arching human resources office to support and serve the many employers within the Archdiocese.  This office is a resource to parishes, schools and other institutions in matters affecting the employee/employer relationship: policies and procedures; employment law, including Federal regulations governing the employment environment; and employee benefits and

retirement." https://archkck.org/our-church/who-we-are/offices/human-resources/

10.     Defendant entities named herein are closely interrelated and operate without functional distinction with respect to the matters of employment for non-ecclesiastical employees, such that the acts of one are the acts of all.

11.     The underlying dispute is secular in nature, not an ecclesiastical one.

12.     Plaintiff's underlying claims are for discrimination, harassment, hostile work environment and retaliation, arising out of her employment.

13.     Defendants make important factual and legal distinctions between the Clergy and Lay employees, treating them differently and applying different policies and procedures to the distinct categories, with different benefits, retirement, compensation, and policies.  For example, lay employees have a different Retirement Plan.

14.     Defendants were Scanlon's Employer, individually and collectively.

15.     The other entities described are considered as part of the Holy Trinity Parish and are located on contiguous tracts of land, also described collectively as the Holy Trinity Catholic Church Campus (the "Campus"), situated at 91st Street and Pflumm Road in Lenexa, Kansas.  The Campus property is owned by the Archdiocese.

16.     The Archdiocese Human Resources staff are responsible for accountability and oversight of the several subordinate entities within the diocese boundaries, which includes the Holy Trinity Early Education Center.

17.     Plaintiff worked with one or more of the Archdiocese staff members on all matters related to the policies, procedures, terms, and conditions of employment, including pay and benefits in the employment relationship.

18.     Applications for Employment are published by and submitted to the Archdiocese for review and approval.

19.     Employees are covered by the various Insurance Policies issued by the Archdiocese, including but not limited to Health, Retirement, Accident Property & Liability Insurance Programs (administered by the Catholic Mutual Group insurance plans) and other insurance benefits.

20.     Employees are covered by the various Employment Policies issued by the Archdiocese, including but not limited to Kansas Workers' Compensation Laws; Family and Medical Leave Act ("FMLA") and provide protection for employees by other Federal and State laws, regulations, policies and procedures, which operate as a waiver of the application of defense or affirmative defense, including the ministerial exception. The Archdiocese Human Resource personnel issued and administered the General Policies & Personnel Information to employees.

21.     In the alternative, for any Defendant entity which is not found to be the statutory employer of Plaintiff, such Defendant is involved as appropriate Defendant herein, as it aided, abetted, incited, compelled and/or coerced the doing of the acts forbidden under the law, through the unlawful employment practices described herein, which resulted in discrimination, and retaliation of Plaintiff.

## JURISDICTION AND VENUE

22.     This employment case arises under Federal and State Law.

23.     This is an action for legal and equitable relief to address the deprivation of Plaintiff's civil rights pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII") based upon Plaintiff's sex and gender, disparate treatment based upon sex and gender, hostile work environment and Defendants' retaliatory conduct directed toward Plaintiff following her opposition to unlawful activity, including financial impropriety, mandatory reporting of child abuse, discrimination and disparate treatment, inappropriate and fraudulent conduct of others, failure to follow policies and reporting of discrimination to an investigative

agency.

24.     Plaintiff seeks all available remedies from Defendants, including compensatory and punitive damages, costs, reasonable attorneys' fees, and equitable relief.

25.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 as the matter involves questions of federal law.

26.     Jurisdiction is proper over Defendants because they transacted business in the State of Kansas, and the discriminatory, retaliatory, and wrongful acts occurred in the State of Kansas.

27.     Venue is proper in this Court as all or a substantial portion of the alleged acts, omissions and occurrences giving rise to the claims asserted occurred in Johnson and Wyandotte County, Kansas.

28.     Defendants, individually and collectively, unlawfully subjected Plaintiff to unlawful discrimination and her sex and gender, which were contributing factors in the hostile work environment, retaliation, adverse employment action, demotion, and negative consequences on her employment in violation of the law.

29.     Additionally, Defendants subjected Plaintiff to several tortious acts including discrimination, retaliation, and hostile work environment.

30.     Plaintiff alleges a continuing violation and pattern of ongoing discrimination, hostile work environment and retaliation.  Plaintiff did not bring this action until after she completed her disability leave, received the necessary medical treatment and rehabilitation which she was required and provided under the applicable short term disability insurance policy which was provided to her as a term and condition of her employment.

31.     As represented by representatives of Defendants, the last official day of Plaintiff's employment status while on disability leave was September 19, 2023.

32.     No Charge has been filed by Plaintiff as Defendants have previously gone on record

and confirmed that there is no jurisdiction of this Court under Title VII to hear employment matters against the Church.  As a result, Defendants have waived and are estopped from claiming that Plaintiff must first file a Charge with the EEOC and/or the KHRC.

33.    Defendants have consistently and repeatedly taken the legal position that the neither the EEOC and/or the KHRC have the authority to investigate and/or issue findings in employment matters, as the ministerial exception applies and prevents employment related claims (which Plaintiff disputes). In fact, in other similar and related employment situations, it was requested by Defendants that the EEOC and/or the KHRC dismiss the Charge and refuse to investigate the unlawful employment practices.  Defendants have gone on record taking the legal position that neither the EEOC, nor the KHRC, has the authority or jurisdiction to investigate or process the charge.  In the related employment circumstance, the KHRC and EEOC listened to the influence of Defendants and terminated its investigation and closed its file.

34.    As a result of Defendants previous legal positions taken, Plaintiff is not required to file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and/or the Kansas Human Rights Commission ("KHRC"), prior to filing a Complaint in Court.

35.    Based upon the factual and legal positions taken by Defendants, Plaintiff is not required to comply with any administrative prerequisites and/or fully exhaust any administrative remedies prior to filing this lawsuit.  Defendants are legally and equitably estopped from taking contrary positions in this matter.

36.    Plaintiff alleges that she has suffered damages in excess of $75,000.00.

37.    The unlawful acts described herein occurred in this judicial district making venue and jurisdiction appropriate in this Court.

38.    Plaintiff was demoted and served in a diminished role and capacity in her job in 2019.  Since at least that time, Plaintiff has been a non-ministerial lay employee.

39.     Defendants are employers or co-employers as they are affiliated and related employer entities of Plaintiff.

40.     Scanlon was previously the Director of the Early Education Center ("EEC").

41.     Richter was hired as an early childhood education teacher in the EEC.  Scanlon is Richter's Aunt.

42.     This court should consider the Plaintiff's role at the EEC since 2019.

## **FACTS**

43.     Plaintiff was employed as a non-ministerial lay employee of Defendants' employer entities.

44.     Scanlon was designated as a person within the "line of authority," which is a term of art in Kansas—a designation for emergency procedures in the childcare center environment. The designation is a technical requirement to comply with state law and regulations and does not require or suggest that Plaintiff be in a high position of authority within the organization.

45.     The Archdiocese is an affiliated and related employer entity, which was Plaintiff's co-employer. They each individually and collectively had the authority to control the terms and conditions of her employment and did so for many years.

46.     Each of the entities played a role in establishing the various employment practices, including implementation of policies, enforcement of procedures, establishing Plaintiff's job descriptions, supervision, discipline, and establishing pay. There are policies issued by each which impacted the terms and conditions of Plaintiff's employment, including aspects related to insurance, retirement, leave, and benefits. The policies apply to Plaintiff as a professional educator and lay non-ministerial member of the staff; The policies distinguish between lay employees and pastoral employees.

47.     The co-employer entities include the following: Archdiocese of Kansas City in Kansas and the Holy Trinity Catholic Church Lenexa.

48.     The entities have both ministerial and non-ministerial employees. The published Policies make it clear that the Archdiocese is an Equal Opportunity Employer, following the State and Federal laws which protect employees against discrimination and retaliation.

49.     These organizations explicitly state that they also follow State and Federal employment laws, including the Family and Medical Leave Act, State and Federal Regulations for Licensing of Child Care Centers; COBRA; Retirement Plans; Fair Labor Standards Act, and other laws which prevent discrimination and retaliation.

50.     The Defendants have individually and collectively waived any defense or affirmative defense, intentionally or inadvertently, to liability through its waiver.  The waiver has occurred through agreements, assurances, artifacts, certifications, and contractual obligations.

51.     Based upon the receipt of the State and Federal Funds, with the require assurances and certifications provided as a condition of receipt of these funds, Defendants are equitably estopped from avoiding application of laws, regulations and policies that prevent discrimination, hostile work environment and retaliation.

52.     These related and affiliated employer entities, individually and collectively, engaged in illegal acts of sex and gender discrimination, hostile work environment, whistleblower retaliation, and retaliation for engaging in protected activity.

53.     Plaintiff Scanlon was forced to retire at least a year earlier than she had previously announced and planned.

54.     The reasons stated for the demotion of Plaintiff were false and pretextual.

55.     The real reason was illegal, discriminatory, and improper discrimination and retaliation.

56.     Plaintiff was a dedicated, loyal, enthusiastic, and hardworking employee for forty (40) years.

57.     Plaintiff received positive feedback and reviews. Plaintiff did not receive any negative evaluations or performance reviews.

58.     In January of 2018, Richter applied for the position of Assistant Director after learning that Assistant Director Cindy Blake announced that she was intending to retire.

59.     There is a policy which cautions against, but does not prohibit, the placement of immediate relatives within the supervisory authority of another immediate relative. The policy is cautionary only and does not prohibit. The hiring was discussed, disclosed, and approved in advance.

60.     Richter was considered for the position because she was the most qualified person and experienced for the position and had been there for many years.  On May 24, 2018, Richter was advised that she would be able to take over for Ms. Blake.

61.     To avoid concerns related to a familial relationship, Mary Kay Scanlon presented a 3-person team approach to the position. Scanlon told Richter that Susan Smith (Assistant Director) would be her direct supervisor and made it clear that Richter would report to Ms. Smith, not Scanlon. This was implemented to avoid any appearance of favoritism since Scanlon was Richter's aunt.  Scanlon wanted to make sure there were no concerns.  The arrangement was approved by Father Koller.  Cindy Blake's last day of employment was on May 25, 2018.

62.     There are overlapping rules and policies which apply to Plaintiff's employment. Specifically, the HTEEC Staff Handbook states "HTEEC is an equal opportunity employer."

63.     There is also a HTEEC Employment Manual and a separate Employee Manual; further, there are Employee Policies issued by the Archdiocese which apply to lay employees.

64.     The Archdiocese is responsible for coordinating and enforcing the various policies

and procedures, expecting compliance with State and Federal employment laws.

65.     The specific Policy mandates: "In order to provide equal employment and advancement opportunities to all individuals, employment decisions at the parish will be based on legitimate, nondiscriminatory criteria, including merit, qualifications, and abilities. Employees are assured of equal opportunity in employment with regards to recruitment, placement, training, compensation, discipline, promotions, demotions, layoffs, and all other conditions and terms of employment without discrimination on the basis of race, color, sex, national origin, age, disability, genetic information, veteran status or any other characteristic protected by law, except religion."

66.     The stated EEO Policy requires reporting and provides for protection against retaliation: "Employees with questions or concerns about any type of unlawful discrimination in the workplace must bring these issues to the attention of their immediate supervisor or the pastor. Employees can raise concerns and make reports without fear of reprisal. Anyone found to be engaging in any type of unlawful discrimination, including retaliation, will be subject to disciplinary action up to and including termination of employment."

67.     There were other policies that applied to Plaintiff from the Staff Handbook, including, but not limited to, the following:  Employment Criteria, p. 4; Confidentiality, p. 5; Archdiocesan Benefits Program, p. 9; Dismissal, p. 12 (misconduct or incompetence); Discipline and Termination, p. 12; Progressive Discipline, p. 12; Termination (mandatory for physical abuse of a child), p. 12; and Issue Resolution, p. 21.

68.     Additionally, the Parish Employee Procedure and Policy Handbook ("Employee Handbook") provides several policies which also applied to Plaintiff's employment, including but not limited to the following:  [The Policy] Applies to all lay employees, p. 2; Handbook of Archdiocesan…applies, p. 2; Diversity and Discrimination, p. 8; Harassment Policy and Code of Ethics Standards, p. 8; Employment at Will, p. 9; Position Description/Changes ("line of authority

to whom the employee reports"), p.9; Confidentiality, p. 16; Hiring of Relatives, p. 17; Appraisal, Discipline, Dismissal, p. 18 ("notify the Parish Administrator as well as the Archdiocesan attorney before taking such action."); Archdiocese Policies Severance, Sec. 6.

69.     These policies were not applied to Plaintiff in a just, equitable, or reasonable manner.  Instead, Plaintiff was targeted and retaliated against for raising concerns, and criticisms about matters Plaintiff was obligated to report or encouraged to bring forward or for supporting others who did so.

70.     Plaintiff was treated differently than other employees, ridiculed, and demoted; Plaintiff was ultimately forced to resign early.  Plaintiff was intimidated by the hostile working environment and feared raising concerns for fear of reprisal.

71.     The adverse employment actions taken against Plaintiff were done without any coaching, verbal warning, or progressive discipline as promised by the Policies.

72.     In May of 2018, when Ms. Blake retired, Richter was promoted to Program Coordinator of the HTEEC. Plaintiff's hiring was reviewed and approved by others (not just Mary Kay Scanlon) and did not violate the Policy. The Anti-Nepotism Policy found in the Parish Handbook (p. 17) is permissive and does not automatically prevent a family member from working within the same line of supervision.

73.     Richter had already previously worked as a part-time and full-time staff member for many years.  To avoid any concerns and in order to mitigate potential problems related to perceived favoritism, Scanlon suggested a plan where the responsibilities would be shared.

74.     Richter was expected to report directly to Susan Smith rather than to Scanlon. A meeting between Stan Nill and Mary Kay Scanlon occurred. At this time, they discussed and approved the position of Assistant Director.

75.     Scanlon sent an email to Stan Nill and Father Mike regarding the announcement

that Susan Smith would take the job of Assistant Director and Richter would become the Program Coordinator. It was explained that Richter would report to Smith. Smith and Richter would share responsibilities since Smith was not full time.

76.     Rather than replace Richter, two other staff members' job shared the Preschool Teaching position. Scanlon advised that this should give Richter more time to work on the website and other tasks expected of the Program Coordinator.

77.     Richter expressed concerns about inaccurate representations regarding fundraising and failure to disclose the true benefactor of the financial proceeds raised from the school auction. Richter complained about the information shared about fundraising for the Early Education Center. Richter questioned the actual recipients of the funds at the school auction.  Scanlon supported Richter in the expressions of these legitimate concerns.

78.     The concern was raised that the money raised was not actually going to fully benefit the Early Education Center. It was felt that the parents should know this, as they may not want to contribute. It was believed that some parents were contributing with the misguided belief that the money they were donating went to their children's school, when in fact, it was not all going there and was being used for other general parish funding purposes.  Both Scanlon and Richter engaged in the expressions of these legitimate concerns.

79.     HTEEC was set up as a non-profit which is how it was promoted to the parish. HTEEC has made sizeable contributions – both to the parish's coffers as well as being a feeder to the elementary school.

80.     The EEC's financial contributionover the past 40 years have routinely and consistently been misrepresented by Father Mike and Stan Nill.

81.     People in the parish were led to believe that the parish propped up the EEC, when in fact, the very opposite was normally true.  HTEEC pays the parish $10,000.00 per month in

rent.

82.     These facts relates to the retaliation for questioning the financial practices of the parish and pretextual basis for the change in reporting (demotion) which was imposed upon Plaintiff.  Plaintiff asserts that financial data relating the the EEC was generally hidden from the members of the parish, even the advisory boards of the parish, at the direction of parish leadership.

83.     Before a meeting with the advisory boards, a "pre-meeting" would be called by Nill and Fr. Mike to reiterate the specifics of the EEC's contribution to the parish were not to be released to the board.  Typically, the EEC financial contributions would offset the losses realized by the elementary school each year.

84.     Leadership was not happy with Richter and Plaintiff for questioning these fundraising practices.

85.     The concerns expressed were legitimate because this was thought to be a financial impropriety and was misleading the parents. Plaintiff expressed concerns about inaccurate representations regarding what entity received the financial benefit from fundraising proceeds from the auction. The reports involved concerns which stated related to the misrepresentation about tax exempt status and the correct entities getting the benefit of the donated funds.  Scanlon also supported Richter in her expressions of these legitimate concerns.

86.     From this point forward, Plaintiff was targeted and unfairly scrutinized in her job.

87.     Plaintiff's Employers did not like to be challenged or questioned; they do not accept any criticism or questioning from women, expecting complete compliance and obedience to their directives.

88.     Stan Nill and Father Mike did not like transparency and discouraged any discussion, to the point of promoting secrecy and ignoring (or selectively enforcing) the written policies and procedures of the Archdiocese.

89.    Father Mike and Stan Nill intimidated any person who disagreed with them, particularly women.

90.    They did this through open ridicule, judgment, scorn and contempt for those that did not agree with the decisions made and imposed.

91.    The hostile work environment and retribution was so severe that Plaintiff was generally afraid to come forward, speak out or report problems and concerns in the workplace. However, Plaintiff did raise specific and legitimate concerns about significant matters.

92.    Father Mike created a very hostile and controlling environment, creating fear in those that did not agree with his decisions or voiced opposition.  He did this by creating a culture of retaliation and retribution.  He also did this by violating the confidence of others.  In fact, Father Mike Koller engaged in the despicable conduct of sharing the confidential communications of members of the parish, by disclosing the subjects of confession with others in the parish office.  In other instances, Father Mike Koller revealed the confidential communications of a couple who had shared marital information with him during counseling.

93.    It was made clear to Plaintiff that everything had to go through Mr. Nill and Father Mike.  If not cleared first by them, they were quickly told of everything that happened. This allowed them to create and maintain the culture of secrecy and retribution for speaking out.

94.    During her employment, Plaintiff also witnessed an incident of reportable child abuse. This occurred in December 2018 and the related investigation also occurred into early 2019. The situation involved an employee who had a grandchild in the Early Education Center.

95.    Plaintiff's claim of Retaliation relates to expressing concerns over the timing and reporting of the circumstances of an incident in December of 2018 where the teacher was accused of abusing a student (her grandchild) and the teacher (specific name redacted) was not sufficiently punished or terminated for her behavior. This happened right around the time of the holiday

Christmas Party. Scanlon also supported Richter in the expressions of these legitimate concerns.

96. Scanlon and Richter were influenced by Stan Nill and Father Koller and discouraged from immediately reporting the incident. By statute and policy, they were mandatory reporters. The person who was involved in the incident which required mandatory reporting was retained and received a raise when others did not (disparate impact).

97. The applicable policies provide examples of circumstances that would justify termination. The specific written example is if a staff member is accused of child abuse. In such instances, the staff member would be placed on leave, and behavior related to verbal or physical abuse of a child would result in termination. That did not happen in this case. Instead, that staff member was rewarded, and Plaintiff was shunned for participating in and supporting the reporting of this incident.

98. The reality was that Father Koller and Stan Nill listened to the "rumor mill" and put more emphasis on their favorite employees.

99. The message this sent was that Plaintiff was no longer part of the Parish Leadership team and was demoted.

100. There was a situation involving favoritism and unsubstantiated workplace gossip which caused problems in the workplace. This situation involved a co-employee teacher who also taught in the HTEEC. The teacher was Erin Kelley Cronin.

101. Ms. Cronin voluntarily left employment at HTEEC. Erin emailed Scanlon and said she was leaving. Erin complained publicly on social media (Facebook) about HTEEC and included criticism about Scanlon and Richter. Erin also sent an email directly to Stan Nill saying that Scanlon and Richter get away with everything.

102. Cronin publicly falsified her credentials and work experience on the Brighton Academy website. Cronin's credentials and prior work experience were known. It was evident

that Cronin misrepresented her training to the next employer because she was listed on the new employer's website and the description of her work experience was not accurate.  Her employer (Brighton Academy) was contacted and told about it, and it got back to Cronin.  Her credentials were removed, and she blamed Plaintiff for being embarrassed by the revealing disclosure of her resume fraud.

103.    Stan Nill and Father Mike were quick to use the information provided by others against Plaintiff because they were looking for ways to punish and retaliate against her.

104.    There was no investigation of whether or not Erin Cronin had, in fact, falsified and misrepresented her work experience.  Instead, Plaintiff's employer used this as a way to target Plaintiff and use the complaints of another (former) employee against Plaintiff.  They finally came up with something they believed would satisfy their plan to get back at Plaintiff and terminate Plaintiff's employment.

105.    Father Mike also questioned the financial condition of the EEC and mentioned that if the downward trend continued, he would be forced to close the EEC.  Plaintiff responded with incredulity, asking them where they would find a new tenant to rent the center at the price of $10,000.00 per month if the EEC was closed.

106.    Richter was demoted from the Program Coordinator position.  Scanlon was also removed from a position of actual authority, demoted and delegated, and was required to report to Scott Merfen.

107.    Plaintiff continued to receive the same pay but was reduced in status, title, authority, and position. The demotion was done without any investigation as required by the Archdiocese's policy and normal practices.  Father Mike and Stan Nill created the unfounded perception that there was a problem with Plaintiff's performance.

108.    There was a meeting held on July 16, 2019, in which the role of the HTEEC was

relegated to be subordinate to the elementary school.  One of points of the meeting was to discuss

Hallie Richter.  It was revealed that there were disgruntled teachers who were interviewed.  The

Archdiocese told Holy Trinity that it was expected to move Richter or terminate her

109.    Plaintiff asked to continue the meeting.  A follow up occurred on July 17, 2019.

Plaintiff reiterated that the change was not justified and that she felt blindsided.  The only response

was "I understand."

110.    Father Mike would often discount criticisms of him or the parish if he did not know

the source.

111.    Scot Merfen provided no value or benefit to HTEEC.  Merfen was not at all versed

in early eduction requirements or needs.  Based upon his testimony in July of 2022, he still is not.

112.    On August 19, 2019, Plaintiff once again raised questions and concerns about the

equity of financial distributions to the various entities within the parish.  I requested that auction

funds raised for the HTEEC programs remain with the EEC.  This angered parish leadership.

113.    On or about August 20, 2019, Nill and Father Mike implemented a new line of

authority for Plaintiff, reguiring that Scanlon report to Scott Merfen.  Plaintiff raised concerns in

an email to Nill dated August 21, 2019.

114.    Many of these factual allegations and statements of fact asserted by Plaintiff herein

were validated and confirmed during the evidentiary hearing before the Court on July 11, 2022, in

Hallie Richter's case.  Specifically, as referenced in the Memorandum and Order issued by the

Court on July 29, 2022, the evidence presented before and during the hearing established the

following:

   a.  Ms. Scanlon was the Director of the EEC, but she specifically walled herself off

    from the supervision of Plaintiff. Ms. Scanlon was not involved in the direct

    supervision of Plaintiff or in the decision-making relating to Plaintiff's departure

from employment. To avoid any concerns about nepotism or perceived favoritism, Ms. Scanlon devised a three-person team approach so that Susan Smith, Assistant Director of the EEC, would be Plaintiff's direct supervisor when Plaintiff took over as Program Coordinator—not Ms. Scanlon.

b. The EEC was but one program in the entire Church organization. When Defendants responded to the EEOC regarding Plaintiff's charge of discrimination, they referred to a group of "Parish Leadership," which did not include Ms. Scanlon. Ms. Scanlon testified in the evidentiary hearing that she was a member of parish leadership, but only because she was the director of a program within the parish. She described her role as serving in an advisory capacity to Father Mike.

c. In August 2019, due in part to financial concerns and disgruntled employees, Ms. Scanlon testified tearfully she was given a "diminished role" and required to report to Scott Merfen, principal of the school, rather than to someone on the parish executive leadership team as in the past. Ms. Scanlon's diminished role and responsibilities continued through May 2022 and until her retirement.

d. The evidence shows beginning in August 2019, Ms. Scanlon had a diminished role, responsibilities, and authority. By May of 2022, Ms. Scanlon had announced her retirement, and a replacement program director (Jillian Pfaff) had been named in April 2022. At that time, Scanlon did not have formal duties and supervisory responsibilities within the parish or the other programs within the parish.

115. Plaintiff was subjected to discrimination, hostile work environment and disparate treatment on a regular and continuous basis since January of 2018.

116. Plaintiff was subjected to retaliation for reporting what Plaintiff considered to be inappropriate and offensive conduct in the workplace.

117.   There was a clear link and causal connection between the disciplinary action Plaintiff received and the protected activity in raising fundraising concerns, reporting child abuse, asserting claims and reporting violations of policy.  Retaliation also involved supporting others for making complaints and raising legitimate concerns.

118.   Plaintiff was subjected to a series of escalating and unwarranted adverse employment actions. The pattern of discrimination and retaliation culminated in feeling the pressure to retire earlier than anticipated.

119.   Plaintiff was replaced earlier than anticipated.  The replacement, Jillian Pfaff, did not initially meet the requirements to become the Director according to the Kansas Department of Health and Environment (KDHE).  This was supported by the fact that Kathleen Wallace was listed as the Director with KDHE until Jillian Pfaff could satisfy the minimum requirements and requisite time period (one year) and apply for approval as Program Director.   Upon information and belief, Jillian Pfaff, received a starting salary which is greater than Plaintiff.  Pfaff is younger than me and less qualified.

120.    As a result of these unlawful activities, Plaintiff has suffered and will continue to suffer lost wages and emotional distress. Plaintiff is seeking all legal and equitable remedies available to Plaintiff, including but not limited to compensation for Plaintiff's lost wages and benefits (including early retirement), compensatory damages for Plaintiff's emotional pain and suffering, damage to her reputation, reinstatement and front pay and benefits and costs and attorneys' fees in this action.

**COUNT I –**
**DISCRIMINATION AND HOSTILE WORK ENVIRONMENT**

121.    Plaintiff incorporates by reference all of the allegations contained in the preceding numbered paragraphs as though fully set forth herein.

122.     At all times relevant to this action, the Defendants have employed six or more employees and are therefore Employers as defined in the law.

123.     During her employment, Plaintiff satisfactorily met the legitimate job expectations of her Employer.

124.     During Plaintiff's employment, she was subjected to acts of discrimination including unfair criticism of her performance, unfair treatment and subjected to other terms and conditions of employment, pay and benefits, which others were not, subjected, as set forth herein.

125.     Plaintiff was discriminated against and constructively discharged for unfair, pretextual reasons.

126.     Plaintiff's gender and sex were the motivating or determining factors in her unfair and discriminatory treatment.

127.     As a direct and proximate result of Defendants' unlawful practices described herein, Plaintiff sustained damages in the form of lost salary, benefits, social security contributions, emotional pain, suffering, inconvenience, loss of enjoyment of life and mental anguish.

128.     Defendants' actions were outrageous and showed an evil motive or reckless indifference or conscious disregard for the rights of Plaintiff and others. Therefore, Plaintiff is entitled to punitive damages from Defendants to punish Defendants and to deter Defendants and others from like conduct.

WHEREFORE, Plaintiff prays for judgment against all Defendants for actual damages, punitive damages, equitable relief and attorney's fees and costs incurred herein. Plaintiff further requests the Court enter such equitable relief as it deems just.

## COUNT II –
## UNLAWFUL DISCRIMINATION AND HOSTILE WORK ENVIRONMENT
## BASED UPON GENDER AND SEX

129.    Plaintiff incorporates by reference all of the allegations contained in the preceding numbered paragraphs as though fully set forth herein.

130.    During Plaintiff's employment, she was subjected to acts of sex and gender discrimination, harassment, hostile work environment, including unfair criticism of her performance, unfair denial of pay and other benefits and ultimately, early retirement.

131.    Plaintiff was subjected to disparate treatment for illegal, unfair, unlawful and pretextual reasons.

132.    Plaintiff's gender and sex were the motivating or determining factors in her unfair and discriminatory treatment.

133.    As a direct and proximate result of Defendants' unlawful practices described herein, Plaintiff sustained damages in the form of lost salary, benefits, social security contributions, emotional pain, suffering, inconvenience, loss of enjoyment of life and mental anguish.

134.    Defendants' actions were outrageous and showed an evil motive or reckless indifference or conscious disregard for the rights of Plaintiff and others. Therefore, Plaintiff is entitled to punitive damages from Defendants to punish Defendants and to deter Defendants and others from like conduct.

WHEREFORE, Plaintiff prays for judgment against all Defendants for actual damages, punitive damages, equitable relief and attorney's fees and costs incurred herein. Plaintiff further requests the Court enter such equitable relief as it deems just.

**COUNT III –**
**RETALIATION**

135.    Plaintiff incorporates by reference all of the allegations contained in the preceding numbered paragraphs as though fully set forth herein.

136.    Plaintiff reported and objected to incidents of discrimination and unlawful employment practices of Defendants.

137.    Defendants retaliated against Plaintiff in numerous ways, as described herein.

138.    Defendants' conduct constitutes retaliation against Plaintiff for her reports and objections to discrimination, in violation of the law.

139.    As a direct and proximate result of Defendants' unlawful practices described herein, Richter sustained damages in the form of lost salary, benefits, social security contributions, emotional pain, suffering, inconvenience, loss of enjoyment of life and mental anguish.

140.    Defendants' actions were outrageous and showed an evil motive or reckless indifference or conscious disregard for the rights of Plaintiff and others. Therefore, Plaintiff is entitled to punitive damages from Defendants to punish Defendants and to deter Defendants and others from like conduct.

WHEREFORE, Plaintiff prays for judgment against all Defendants for actual damages, punitive damages, equitable relief and attorney's fees and costs incurred herein. Plaintiff further requests the Court enter such equitable relief as it deems just.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all issues.

**DESIGNATION OF PLACE OF TRIAL**

Plaintiff hereby designates the Federal Court in Kansas City, Kanas as the place of trial.

Respectfully submitted,

**GATES SHIELDS FERGUSON
SWALL HAMMOND, P.A.**

*/s/* Mark A. Ferguson
Mark A. Ferguson KS# 14843
10990 Quivira; Suite 200
Overland Park, KS 66210-1284
Telephone: (913) 661-0222
Facsimile: (913) 491-6398
markferguson@GatesShields.com

**ATTORNEY FOR PLAINTIFF**